Slip Op. 21-130

UNITED STATES COURT OF INTERNATIONAL TRADE

M S INTERNATIONAL, INC.,

                Plaintiff,

       and

FOSHAN YIXIN STONE COMPANY LIMITED,

                Consolidated Plaintiff,

       and

ARIZONA TILE LLC,

                Plaintiff-Intervenor,

       v.

UNITED STATES,

                Defendant,

       and

CAMBRIA COMPANY LLC,

                Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Consol. Court No. 19-00140

**OPINION**

[Commerce's <u>Final Determination</u> is sustained.]

Dated: September 24, 2021

     <u>Matthew T. McGrath</u> and <u>Mert E. Arkan</u>, Barnes, Richardson & Colburn, LLP, of Washington, D.C., for Consolidated Plaintiff Foshan Yixin Stone Company, Ltd.

    Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director.  Of counsel was Jesus Saenz, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance, of Washington, D.C.

    Luke A. Meisner, Kelsey M. Rule, and Roger B. Schagrin, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Cambria Company LLC.

    Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final determination in its antidumping ("AD") investigation of certain quartz surface products ("QSPs") from the People's Republic of China.  See Quartz Surface Products from the People's Republic of China, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019) ("Final Determination"), and the accompanying Issues and Decision Memorandum, A-570-084 (Dep't of Commerce May 14, 2019), ECF No. 37-4 ("Decision Memorandum").

    Before the court is the motion for judgment on the agency record under USCIT Rule 56.2 filed by Consolidated Plaintiff Foshan Yixin Stone Company, Ltd. ("Plaintiff" or "Yixin").  See Pl.'s Mem. in Supp. Mot. J. Agency R., ECF No. 49[1] ("Yixin Br."); see also Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. Agency R., ECF No. 81 ("Def.'s Resp."); Def.-Intervenor Cambria Co.'s Resp. to Pls.' Rule 56.2 Mot. for J. Agency R., ECF No. 82 ("Def.-Intervenor's Resp."); Pl.'s Reply Br., ECF No. 84 ("Yixin Reply").  The court has

---

[1] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018).

To facilitate the efficient disposition of this action, this opinion focuses only on the respondent-specific challenges raised by Foshan Yixin.  See Scheduling Order at 1, ECF No. 71 (directing separate briefing schedule for issues raised by Foshan Yixin); see also Order, ECF No. 72 (staying all briefing in action except for that relating to Foshan Yixin's motion for judgment on agency record).  For the reasons set forth below, the court sustains Commerce's Final Determination.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2021).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Background

### A. Legal Framework

In an AD duty investigation, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price and the normal value of the merchandise.  See 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a).  In the non-market economy ("NME") context, Commerce

calculates normal value using data from surrogate market economy countries to value the factors of production ("FOPs").  See 19 U.S.C. § 1677b(c)(1)(B).  Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate countries.  See 19 U.S.C. § 1677b(c)(1)(B), (c)(4).  Commerce has a stated regulatory preference to "normally … value all factors in a single surrogate country."  See 19 C.F.R. § 351.408(c)(2).

The antidumping statute requires that surrogate data must "to the extent possible" be from a market economy country or countries that are (1) "at a level of economic development comparable to that of the [NME] country" and (2) "significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  The statute does not define the phrase "level of economic development comparable to that of the [NME] country," nor does it require Commerce to use any particular methodology in determining whether that criterion is satisfied.  Commerce has developed a four-step method to select a surrogate country:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the NME country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

Vinh Hoan Corp. v. United States, 39 CIT ___, ___, 49 F. Supp. 3d 1285, 1292 (2015) (quoting Import Admin., U.S. Dep't of Commerce, Non–Market Economy Surrogate

Consol. Court No. 19-00140                                           Page 6

Country    Selection    Process,    Policy    Bulletin    04.1    at    2    (2004),
http://enforcement.trade.gov/policy/bull04–1.html ("Policy Bulletin 04.1")).

### B. Procedural History & Determinations Specific to Yixin Stone

Consistent with 19 U.S.C. § 1677b(c)(4) and Policy Bulletin 04.1, Commerce compiled a list of market economy countries at a level of economic development comparable to China.  See Decision Memorandum at 53 (noting countries on list were Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russian Federation).  The parties submitted complete surrogate data for Mexico, limited surrogate data for Malaysia, and no data for the other countries.  See id. at 54 ("[W]e found that parties placed complete data for Mexico, and limited data for Malaysia, on the record; and that no party provided complete surrogate value information for the other countries on the list (i.e., for Brazil, Kazakhstan, Romania, or Russia), or argued in favor of using surrogate value information for any other the other countries.").

In accordance with § 1677b(c)(1)(B), Commerce calculated the weighted-average dumping margin for Yixin by comparing Yixin's own prices for the merchandise it sold to the United States with the normal value of the merchandise.  See id. at 45.  To calculate the normal value, Commerce used Yixin's FOPs and the surrogate values ("SVs") selected from a market economy country at a level of economic development comparable to China.  See id.

Commerce's calculation of Yixin's dumping margin was thus based on three components: (1) Yixin's U.S. prices; (2) Yixin's FOPs; and (3) SVs used to value the FOPs.  Id. at 45.  To determine Yixin's U.S. prices and FOPs, Commerce used Yixin's

own reported data with no adverse inferences.  Id.  To calculate the SVs, Commerce determined that, among the market economy countries at a level of economic development comparable to China, Mexico was a significant producer of identical merchandise, and that both Mexico and Malaysia were significant producers of comparable merchandise.  See id. at 53.  Commerce further determined that the Mexican data were the best available surrogate data for valuing Yixin's FOPs because there were "complete, specific Mexican [Global Trade Atlas ("GTA")] data for each input used by [Yixin], while [there were] limited Malaysian GTA data on the record … and the Mexican surrogate financial statements on the record [were] for a company which produces ceramic wall and floor tiles (which are comparable to quartz surface products), while it [was] unclear whether the Malaysian surrogate financial statements [were] for manufacturers or merely finishers/fabricators of stone surface products."  Id. at 54.  As a result, Commerce found that "Mexico [was] the best choice for surrogate country" because it was "1) at a similar level of economic development to China; 2) a significant producer of both comparable and identical merchandise; and 3) because Mexico [had] the best data availability."  Id. at 55.  Commerce emphasized that it has "a regulatory preference 'to value all factors in a single surrogate country'" and "a practice 'to only resort to a second surrogate country if data from the primary surrogate country are unavailable or unreliable.'"  Id. at 66.  Consequently, Commerce used Mexican data to value all FOPs and relied on the financial statements of a Mexican tile producer, Grupo Lamosa, to calculate surrogate financial ratios.  See id. at 74, 85.  This resulted in a

weighted-average dumping margin for Yixin of 333.09 percent.   <u>Final Determination</u>, 84 Fed. Reg. 23,769.

Plaintiff raises several challenges to Commerce's <u>Final Determination</u>.  Plaintiff argues that its assigned dumping margin is not grounded in commercial or economic reality and is therefore unlawful. <u>See</u> Yixin Br. at 3.  Plaintiff also contends that Commerce unreasonably selected Mexico as the primary surrogate country, maintaining that Mexico is neither a producer of identical merchandise nor a producer of comparable merchandise, and that Commerce should have instead selected Malaysia as the primary surrogate country.  <u>See</u> <u>id.</u> at 7.  Plaintiff also argues that Commerce unreasonably selected Mexican data to value Plaintiff's FOPs and Mexican financial statements to calculate surrogate financial ratios.  Lastly, Plaintiff contends that—even if it was reasonable for Commerce to use financial statements from Mexico—Commerce should have averaged the financial statements of Grupo Lamosa with the financial statements of Unigel, another Mexican tile producer.  <u>See</u> <u>id.</u> at 16, 19, 21, 23.

### III. Discussion

#### A. Dumping Margin & Commercial and Economic Reality

Yixin argues that its 333.09% margin is "an absurd, commercially and economically unrealistic figure," and "the inevitable consequence of the Department's use of aberrational Surrogate Values ("SVs") to calculate Yixin's Cost of Production ("COP") under U.S. Non-Market Economy ("NME") antidumping methodology."  Yixin Br. at 3–4. Yixin contends that in calculating the margin, Commerce "has not satisfied its legal requirements if it simply 'conducted its surrogate value determinations in accordance with

the relevant legal authorities and supported its determinations with substantial evidence'
because under the law, assigned surrogate values ("SVs") must still be within 'limits of
permissible approximation.'" Id. at 4.  Yixin requests that the court instruct Commerce
"to reevaluate its selections in order to calculate a margin which is commercially and
economically feasible."  Id.

Relying on Baoding Mantong Fine Chemistry v. United States, 39 CIT ___, ___,
113 F. Supp. 3d 1132, 1334 (2015) ("Baoding I"), Plaintiff argues that the margin
determined by Commerce is unlawful, and thus must be recalculated, as it "[defies]
commercial and economic reality."  See Yixin Br. at 3–4 (quoting Baoding I, 39 CIT at ___,
113 F. Supp. 3d at 1334); Yixin Reply at 2 ("Baoding I … established a 'commercially
impossible standard' for instances where the Department's calculated antidumping
margin is absurdly high … that the antidumping margin must be understood as
unsupported by substantial evidence, and otherwise contrary to law, as a result of the
Department not considering adequate information on the record.").  Yixin contends that
its margin is "commercially impossible" because it would have had to sell the merchandise
at an export price that would have resulted in massive operating losses, and the financial
statement Yixin submitted does not show any losses.  Yixin Br. at 4–5.  Additionally, Yixin
points out that nothing in the record supported a finding of "domestic or export subsidies
sufficient to offset such enormous losses."  Id. at 5.  Yixin thus concludes that
"[t]he apparent logic of producing an article at significant cost and practically giving it
away, as represented by a 333.09 percent margin, defies commercial and economic
reality in either a market economy or a non-market economy."  Id.

In <u>Baoding I</u>, the plaintiff there challenged Commerce's calculations of SVs that were the basis for the large dumping margin (453.79%) and argued that "[e]ven where Commerce has acted in conformity with its statutory and regulatory obligations, the resulting dumping margin must be examined for its accuracy and fairness." <u>Baoding I</u>, 39 CIT at ___, 113 F. Supp. 3d at 1336. The court stated that, under 19 U.S.C. § 1675(a)(2)(A), Commerce is required to "determine margins as accurately as possible," and "to calculate antidumping duties in a way that is fair and equitable." <u>Baoding I</u>, 39 CIT at ___, 113 F. Supp. 3d at 1334 (citing <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, 716 F.3d 1370, 1379 (Fed. Cir. 2013) and <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565,1573 (Fed. Cir. 1994)). The court elaborated that Commerce is "no less obligated to determine, fairly and equitably, margins that are remedial and not punitive" when "determining the normal value of subject merchandise according to specialized procedures applicable to goods produced in nonmarket economies." <u>Baoding I</u>, 39 CIT at ___, 113 F. Supp. 3d at 1337. The court also noted that, "[a]lthough calculating normal value 'for a producer in a nonmarket economy country is difficult and necessarily imprecise,' the method used by Commerce still must fall within 'the limits of permissible approximation.'" <u>Id.</u>, 39 CIT at ___, 113 F. Supp. 3d at 1337–38 (quoting <u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1408 (Fed. Cir. 1997)).

<u>Baoding I</u> held that Commerce failed to fulfill its obligation "to determine the most accurate margin possible" when it assigned the plaintiff there a weighted average dumping margin of 453.79% because this margin was "not realistic in any commercial or economic sense and punitive in its effect." <u>Id.</u>, 39 CIT at ___, 113 F. Supp.3d at 1334.

Critically, the court stated that "the record lack[ed] substantial evidence to support a finding that the 453.79% margin ha[d] any relationship to Baoding's commercial reality, and the record evidence of Baoding's profitability is contrary to any such finding." Id., 39 CIT at ___, 113 F. Supp. 3d at 1339.

In its Final Determination here, Commerce "disagree[d] with Yixin Stone that the margin [wa]s unreasonable or inaccurate or that it fail[ed] to reflect commercial reality," and "disagree[d] that Commerce should recalculate Yixin Stone's margin." Decision Memorandum at 46–47.  Commerce explained that, although Yixin submitted financial statements showing that Yixin made a profit during the period of investigation ("POI"), Commerce disagreed with Yixin's contention that "its profitability proves that its margin is commercially impossible." See id. at 46 ("We note that profit is a function of not only the revenue a company earns, but also the costs that it incurs.  The presence of pervasive governmental controls in NME countries (e.g., related to assets and investments, allocation of resources, etc.) renders the allocation of an NME company's production costs invalid under Commerce's normal dumping methodology.  While we acknowledge that Yixin Stone's financial statements do show a profit, we cannot be assured that Yixin Stone would have made a similar profit had it been located in a market economy country.").  In reaching its conclusion, Commerce rejected the applicability of Baoding I, relying instead on Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1334 (Fed. Cir. 2016).  See id.

In the underlying administrative review there, Commerce drew adverse inferences to Nan Ya when selecting among the facts available to calculate Nan Ya's dumping

margin, and "relied upon the highest transaction-specific margin of 74.34% that it calculated for the other mandatory respondent in the review."  Id., 810 F.3d at 1338. Nan Ya did not challenge Commerce's decision to apply adverse facts; instead, Nan Ya argued that Commerce erred by failing to select an "accurate" adverse facts available rate that reflects "commercial reality."  Id., 810 F.3d at 1341.

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") rejected Nan Ya's argument and sustained Commerce's margin calculation.  Id.  The court stated that "Congress has provided specific methods for Commerce to employ when it executes its duties, such as in calculating normal value or export price … or when the agency assigns rates on the basis of adverse facts available," and that, "[w]hen Congress directs the agency to … execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties."  Id., 810 F.3d at 1343–44.  The court explained that a dumping margin determination "(1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law."  Id. at 1344.

Relying on the Federal Circuit's guidance in Nan Ya Plastics, Commerce here concluded that its calculations were proper because they were "1) in accordance with [its] normal NME practice; 2) factually and mathematically correct; and 3) supported by information on the record and in accordance with the law."  Decision Memorandum at 46. Plaintiff maintains that Nan Ya Plastics did not invalidate the "commercial impossibility" standard set forth in Baoding I.  See Yixin Br. at 6 (citing Baoding Mantong Fine Chemistry

v. United States, 41 CIT ___, ___, 222 F. Supp. 3d 1231, 1239 (2017) ("Baoding II"));
Yixin Reply at 2.  Plaintiff emphasizes that, in Baoding II, the court "stated explicitly that
the holding in Nan Ya Plastics did not 'invalidate the basis of the court's order in
Baoding [I].'"  Yixin Br. at 6.  Specifically, Plaintiff maintains that the Court of International
Trade "has explicitly distinguished its 'commercially impossible standard' from [the]
holding in Nan Ya Plastics … because Nan Ya Plastics addresses instances where an
antidumping duty margin may or may not be grounded in 'accuracy or commercial reality,'
whereas Baoding I addresses instances where the calculated antidumping duty margins
clearly 'signif[ied] commercial impossibility.'"  Yixin Reply at 3 (citing Baoding II, 41 CIT
at ___, ___, 222 F. Supp. 3d at 1239).

The court in Baoding II noted that the factual circumstances in that matter
significantly differed from those presented in Nan Ya Plastics.  See Baoding II, 41 CIT
at ___, 222 F. Supp. 3d at 1239 ("Nan Ya Plastics Corp. upheld an antidumping duty rate
of 74.34% as facts otherwise available, and an adverse inference, … for a respondent
that refused to participate in an administrative review of an antidumping duty order.  …
This case involves … an administrative review of an antidumping duty order in which
Commerce assigned an individual weighted average dumping margin of 453.79% to a
cooperative respondent.").  The Baoding II court also concluded that the determination of
a 453.79% margin for Baoding did not satisfy even the standard set forth in Nan Ya
Plastics.  See Baoding II, 41 CIT at ___, 222 F. Supp. 3d at 1239 ("even if Nan Ya Plastics
Corp. were considered to be a holding controlling the outcome of this case (which it is
not), the guidance the Court of Appeals provided in its opinion would not support the

notion that the court's order remanding the Final Results is invalid").  The court further noted that "Nan Ya Plastics Corp. did not hold that Commerce is free to assign to a cooperative respondent a weighted-average dumping margin that is shown by record evidence—in particular, the evidence that the merchandise in question was not sold at a loss during the [period of review]—to be so enormously high as to be punitive." Baoding II, 41 CIT at ___, 222 F. Supp. 3d at 1239.

In opposing Yixin's argument regarding the applicability of the Baoding decisions, Defendant and Defendant-Intervenor rely on the recent decision in TT Int'l Co. v. United States, 44 CIT ___, ___, 439 F. Supp. 3d 1370 (2020) ("TTI"), in which the court rejected the idea that Baoding I established a separate "commercial impossibility" test.  See Def.'s Resp. at 24–25; Def.-Intervenor's Resp. at 2–4. In TTI, the plaintiff challenged the assignment of a 285.73% dumping margin because it "defie[d] commercial and economic reality."  TTI, 44 CIT at ___, 439 F. Supp. 3d at 1385.  The court rejected this argument as based on the "mistaken premise that the value of the dumping margin, distinct from the components that constitute the margin, may be challenged."  Id.  The court noted that "Baoding I did not establish a separate, 'backstop' test for high margins that could independently require a remand if found by the court to be 'commercially impossible.'"  Id. Instead, TTI emphasized that the remand in Baoding I was not based on the resulting margin alone, but also on the fact that Commerce had erred in its selection of SVs. See id.  Accordingly, the court in TTI rejected a challenge to the allegedly "inaccurate and commercially unrealistic" dumping margin of 285.73%, concluding that plaintiff there had

failed to demonstrate that the inputs into Commerce's margin calculations were unsupported by the record.  See TTI, 44 CIT at ___, 439 F. Supp. 3d at 1386.

Yixin's argument here is analogous to arguments previously rejected by the court in TTI.  Plaintiff attempts to challenge the result of a dumping margin calculation independently from the components that constitute the margin by framing its challenge as a legal argument based on the Baoding decisions.  See Yixin Br. at 3–6.  Specifically, Plaintiff here maintains that Commerce "has a statutory and legal mandate to 'calculate margins as accurately as possible' in a way that is 'fair and equitable,'" and that Commerce "has not satisfied its legal requirements" by conducting its determinations "in accordance with the relevant legal authorities" and by supporting them with substantial evidence.  See id. at 4 (citing Baoding II, 41 CIT at ___, 222 F. Supp. 3d at 1239).  Plaintiff further argues that Commerce "must adopt a different approach in calculating the margins … to remain in accordance with law."  Id. at 6.  Plaintiff does not cite, however, any statutory provision that Commerce may have violated.  Plaintiff does not even cite to the foundational decision in Chevron, which provides the framework necessary for the court's analysis of legal arguments.  See Yixin Br. at 3–7; see also Chevron, 467 U.S. at 842–45.

Here, Plaintiff's argument that the margin calculated by Commerce independently requires a remand as "an absurd, commercially and economically unrealistic figure" only challenges the result of Commerce's calculations, rather than the reasonableness of the inputs selected by Commerce as a basis for its dumping margin calculations.  See Yixin Br. at 3–7; cf. TTI, 44 CIT at ___, 439 F. Supp. 3d at 1385.  Unfortunately for Plaintiff, "[a]dministrative decisions should be set aside … only for … procedural or substantive

reasons as mandated by statute, … not simply because the court is unhappy with the result reached." See Nan Ya Plastics, 810 F.3d at 1334–35 (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council Inc., 435 U.S. 519, 588 (1978)).  Furthermore, the term "commercial reality" does not appear in the statute, and "the statute, or Commerce's permissible interpretation of it, provides the backdrop against which [a court] must review the agency's determination."  See id., 810 F.3d at 1334–35 (citing Chevron, 467 U.S. at 842–43); 19 U.S.C. § 1677b ("[T]he administering authority shall determine the normal value of subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise … the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries … ").  Thus, to prevail on its challenge here, Plaintiff must show that Commerce's calculations are not mathematically or factually correct, or inconsistent with the method provided in the statute.  See Nan Ya Plastics, 810 F.3d at 1334.  Consequently, merely arguing that a margin is "an absurd, commercially and economically unrealistic figure," is not sufficient to show "that the margin is contrary to law or unsupported by substantial evidence."  See TTI, 44 CIT ___, ___, 439 F. Supp. 3d at 1385.  The court therefore rejects Plaintiff's legal arguments relying on the Baoding decisions.

Although Plaintiff styles its arguments as a legal challenge, the crux of Plaintiff's challenge appears to be focused on Commerce's application of 19 U.S.C. § 1677b—the statutory provision governing the method that Commerce must follow in calculating a dumping margin in the NME context.  Arguments challenging the agency's application of

statutory provisions require the court to consider factual information on the record and evaluate the agency's decision against the substantial evidence standard (reasonableness review).  See 19 U.S.C. § 1516a(b)(1)(B)(i); see also TTI, 44 CIT at ___, 439 F. Supp. 3d at 1374 n.1 ("Although TTI states that it challenges Commerce's Final Results as contrary to law, the court understands TTI to make substantial evidence arguments.  Therefore, the court will examine whether the Final Results are supported by substantial evidence and are in conformity with law." (internal citations omitted)).  The court thus turns to Plaintiff's arguments challenging whether Commerce's margin calculations were unsupported by substantial evidence, specifically the reasonableness of Commerce's surrogate country and surrogate value selections.[3]

### B. Surrogate Country Selection

In determining the normal value of the subject merchandise under 19 U.S.C. § 1677b(c)(4), Commerce evaluates the respondent's FOPs based on the values of those factors "in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Here, Commerce found that, among the countries at a level of economic development comparable to China, "Mexico meets the criteria of [§ 1677b(c)(4)] as being 1) at a similar level of economic

---

[3] Notably, in its reply brief, Yixin did not even continue to press its arguments that Commerce's surrogate country and surrogate value selections were unsupported by substantial evidence.  See generally Yixin Reply.  Instead, Yixin chose to only reiterate its meritless arguments relating to "commercial impossibility" and the Baoding decisions. Id.

development to China; 2) a significant producer of both comparable and identical merchandise; and 3) because Mexico has the best data availability," and thus found that "Mexico is the best choice for surrogate country." Decision Memorandum at 55. Plaintiff does not challenge Commerce's finding that Mexico is at a level of economic development comparable to China. See Yixin Br. at 7 n.1. Rather, Plaintiff questions the reasonableness of Commerce's finding that Mexico is a significant producer of identical and comparable merchandise, as well as the finding that Mexico has the best available data. Id. at 7. Plaintiff argues that Commerce should have instead selected Malaysia as the primary surrogate country "because substantial evidence supports the conclusion that Malaysia, unlike Mexico, is a country with comparable economic development to China, is a significant producer of identical and comparable merchandise, and the available data yields reliable, i.e., non/aberrational data to construct Yixin's [costs of production] under the NME methodology." Id.

### 1. Significant Production of Identical Merchandise

Neither the antidumping statute nor its implementing regulations define "significant producer of comparable merchandise," but Commerce has promulgated Policy Bulletin 04.1, which sets forth how the agency evaluates and defines both the terms "comparable merchandise" and "significant producer." See Decision Memorandum at 55 (citing Policy Bulletin 04.1). Policy Bulletin 04.1 states that "comparable merchandise" is "best determined on a case-by-case basis," and Commerce further noted that "in all cases, if a country produces identical merchandise, it would also be a producer of comparable merchandise." Id. at 55 n.269 (citing Policy Bulletin 04.1). The Policy Bulletin further

provides that "the meaning of 'significant producer' can differ significantly from case to case, and that 'fixed standards' … have not been adopted in Commerce's surrogate country selection process." Id. at 55 (citing Policy Bulletin 04.1).  It also states that, in assessing whether a country is a significant producer of comparable merchandise, "Commerce considers whether all of the potential surrogate countries … have significant exports of comparable merchandise …  and [does] not consider levels of significance in comparison with other countries." Id. (citing Policy Bulletin 04.1).

Applying this policy, Commerce found that Mexico is a significant producer of merchandise identical to the QSPs produced by Yixin—and therefore of comparable merchandise—by relying on information submitted by the petitioner, Cambria Company LLC ("Cambria"), in its Rebuttal Surrogate Country Comments and the accompanying Exhibit 22.  See Decision Memorandum at 53 (citing Petitioner's Letter, "Re: Certain Quartz Surface Products from the People's Republic of China: Comments on Surrogate Country Selection," at 4–10 & Ex. 22, PR[4] 580–87 (Sept. 10, 2018) ("Petitioner Surrogate Country Comments")).

Plaintiff challenges Commerce's finding that Mexico is a significant producer of identical merchandise, contending that "at no point during this investigation" had Cambria ever claimed that Mexico is a significant producer of identical merchandise and that "the first and only statement made on this issue was by the Department in the QSP Final Determination IDM."  Yixin Br. at 10 (citing Decision Memorandum at 53).  Plaintiff's

---

[4] "PR ___" refers to a document contained in the public administrative record, which is found in ECF No. 21-5 unless otherwise noted.

argument is contradicted by the record.  In its preliminary determination, Commerce found that "[i]nformation on the record indicates that Mexico is a significant exporter of merchandise covered by HTS categories identified in the scope of this investigation (i.e., identical merchandise)" and that "Mexico's position as a producer of identical merchandise, in conjunction with better data availability for Mexico … make Mexico the preferred surrogate country."  See Preliminary Decision Memorandum at 10–11, PR 872 (emphasis added).  Even though it did not explicitly state that Mexico is a significant producer of "identical" merchandise, Cambria, in Exhibit 22, did include data on Mexico's production of QSP, demonstrating that Mexico produces merchandise identical to that produced by Yixin.  See Petitioner Surrogate Country Comments at Ex. 22.  Accordingly, the court concludes that there is no merit in Yixin's challenge on this issue.

Plaintiff next argues that Commerce "did not include any discussion as to whether the production and export of the identical merchandise was sufficient to qualify Mexico as a significant producer of identical merchandise."  Yixin Br. at 10.  Yixin maintains that Commerce "supported its determination with a general reference to the narrative of Petitioner's rebuttal surrogate country selection comments … and accompanying Exhibit 22, which shows negligible imports from Mexico to the United States" of the product in question.  See id. (referencing Commerce's Decision Memorandum at 53).  Plaintiff emphasizes that Exhibit 22 only shows that Mexico exported to the United States around 5,142 square meters of QSP, whereas China exported around 5,615,462 square meters of the same merchandise to the United States.  See id. (citing Petitioner Surrogate Country Comments at 4–10 and Ex. 22).  According to Plaintiff, Commerce "has required

in the past that a country produce a 'commercially viable' volume of exports to be considered a significant producer," and argues that "there is no evidence" that the volume of Mexico's exports is sufficient to reach that threshold.  Id. at 10–11.

In response to Yixin's comment that "Mexico is not a significant producer of identical merchandise … due to its level of exports relative to China," Commerce stressed that the antidumping statute grants Commerce discretion in identifying a "significant producer," and that, in accordance with Policy Bulletin 04.1, "Commerce considers whether all of the potential surrogate countries … have significant exports of comparable merchandise … and [does] not consider levels of significance in comparison with other countries."  Decision Memorandum at 55 (citing Policy Bulletin 04.1).  More specifically, Commerce explained that "[s]o long as a country produces a commercially viable amount of exports, [Commerce] considers them a significant producer."  Id. at 56.  Commerce concluded that, although "Mexico may not export the same amount of identical merchandise as China," this alone is insufficient to compel Commerce to revisit its finding that Mexico is a significant producer of QSP.  Id.

19 U.S.C. § 1677b(c)(1)(4) does not indicate the amount of production necessary to find that a production of identical merchandise is "significant."  Given that, a reasonable mind could find that Mexico's QSP production of 5,142 square meters is "commercially viable," considering that the QSP production values on the record range from 3 square meters (Bahamas) to 5,615,462 square meters (China).  See Petitioner Surrogate Country Comments at Exhibit 22.  While Plaintiff decries the relatively low level of QSP production in Mexico as compared to China, Plaintiff fails to explain what threshold

amount of production is or should be required to be reasonably considered "significant." See Yixin Br. at 10–11.  Plaintiff's arguments fail to engage with Commerce's rationale for its surrogate country selection.  See Decision Memorandum at 54–56 (noting that "[w]hile Mexico may not export the same amount of identical merchandise as China, as stated above, we do not look into levels of comparable significance.  So long as a country produces a commercially viable amount of exports, we consider them a significant producer. … Yixin Stone has not provided a sufficient basis to compel Commerce to revisit the preliminary finding with respect to Mexico's production of subject merchandise, and we consider Mexico as a significant producer of quartz surface products and comparable products.").  Plaintiff acknowledges that Commerce "has required in the past that a country produce a 'commercially viable' volume of exports to be considered a significant producer." Yixin Br. at 10.  Nevertheless, Yixin argues that the record fails to demonstrate that the Mexican volume of QSP exports is commercially viable.  Id.  Yixin's argument, however, ignores its duty to paper the record to obtain its desired outcome.  In that respect, Yixin fails to provide any basis on which the court could conclude that Commerce unreasonably found that Mexican exports of QSPs were at a "commercially viable" threshold.  The court therefore concludes that Commerce reasonably found Mexico to be a significant producer of identical merchandise.

### 2. Significant production of comparable merchandise

Commerce used a three-prong comparability test to assess whether ceramic tiles produced in Mexico were "comparable merchandise" with respect to the subject QSPs. Decision Memorandum at 58 ("Although the statute does not define what constitutes

'comparable merchandise,' it is Commerce's practice to, where appropriate, apply a three-prong test that considers the: 1) physical characteristics; 2) end uses; and 3) production processes."). Commerce found that the physical characteristics, end uses, and production processes of QSP and ceramic tiles were comparable. Id. at 58–63. Plaintiff challenges each of these findings. Yixin Br. at 11–13.

As to the physical characteristics, Plaintiff maintains that "there are significant differences in thickness and layering" between QSPs and tiles, noting that while "QSP are manufactured as large, thick, monolithic singular slabs … tiles are far smaller, thinner, and composed of discrete multiple elements that are pieced together." Id. at 11–12. Plaintiff further states that the two products are "predominantly composed of non-comparable and distinct materials" because "QSP is stone-based … whereas ceramic tiles are generally made from a slurry of clays and other inorganic materials." Id. Plaintiff also notes that Chapter 68 of the Harmonized Tariff Schedule classifies QSP products as "articles of stone," and Chapter 69 classifies ceramic tiles as "ceramic products." Id. at 12. Commerce rejected Yixin's proposed distinctions, finding that the physical characteristics of the two products merely need to be "comparable," not "identical." Decision Memorandum at 59. Commerce further noted that information provided by Cambria indicated that ceramic tiles can be "as large as a standard quartz slab," and that "quartz is often used in the production of ceramic tile, and that the suppliers of quartz inputs to ceramic tile producers often supply quartz inputs to quartz surface product producers." Id. (citing Petitioner Surrogate Country Comments at Exs. 2–6). Thus, Commerce found

based on the record that the physical characteristics of ceramic tiles and QSP are comparable.  Id.

As to the "end uses," Plaintiff argues that while the "predominant use for QSP is for counter surfaces in kitchens and bathrooms," the predominant use for ceramic tiles is "in floor and wall surfaces."  Yixin Br. at 12–13.  Plaintiff further contends that QSPs are primarily chosen for structural and functional reasons, whereas ceramic tiles are primarily used for decorative purposes.  Id.  Yixin also emphasizes that "neither the Department nor Petitioner have ever claimed that ceramic tile has competitive equivalence to QSP producers or that it could operate as a substitute product."  Id. at 13.

Commerce rejected Yixin's contentions as to the different "end uses" between QSPs and ceramic tile, finding that the uses of QSPs are not limited to the surfaces indicated by Yixin, and that QSPs can be also used in "flooring, wall facing, shower surrounds, and as tiles."  Decision Memorandum at 60.  Commerce also noted that "while [QSPs] might be, in some instances, chosen for structural and functional reasons, there is undoubtedly a level of decorative purpose inherent to them—as evidenced by the myriad patterns and designs used by the various manufacturers and the elaborate product brochures created to market the various designs."  Id.  Thus, Commerce found that the record demonstrated that "ceramic tile has similar end uses to [QSPs]."  Id.

Lastly, as to the "production process," Plaintiff argues that "the Department and Petitioner point to only very general and superficial similarities in the production of both QSP and ceramic tile, as both processes involve mixing primary materials with a binder before being formed into shape, as evidence of alleged similarities in the manufacturing

process." Yixin Br. at 13. Yixin maintains that "the record demonstrates that the types of manufacturing equipment used in this process are, in fact, significantly different." Id. Commerce, however, found little merit in Yixin's proposed distinctions between the production processes for QSPs and ceramic tile. The agency reiterated that production processes merely need to be comparable, not identical, for purposes of Commerce's comparability analysis. Decision Memorandum at 60. Commerce further noted that ceramic tiles share five of the seven production steps used for QSP and that the two production processes use similar machinery. Id. at 60–61 (noting that the stages involved in the production of QSP are: (1) mixing; (2) combining; (3) dispensing and molding; (4) pressing; (5) curing; (6) cooling, and (7) polishing, and that ceramic tiles' production process involves mixing, molding, pressing, curing, and polishing). Thus, Commerce concluded that the record supported a finding that the production processes of ceramic tiles and QSPs are comparable. Id. at 61.

Plaintiff's arguments before the court fail to demonstrate that Commerce's application of its three-prong comparability analysis yielded unreasonable findings. See Yixin Br. at 11–13. While Yixin emphasizes other evidence on the record that may have allowed Commerce to reasonably conclude that QSPs and ceramic tile are not comparable, Yixin fails to demonstrate that its preferred outcome was the one and only reasonable conclusion on the record. See Goodluck India Ltd. v. United States, Appeal No. 20-2017, 2021 WL 3870722 at *7 (Fed. Cir. Aug. 31, 2021) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by

substantial evidence." (quoting Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)); Globe Metallurgical, Inc. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1269, 1276 (2012) (substantial evidence review "contemplates that more than one reasonable outcome is possible on a given administrative record").  Accordingly, the court sustains Commerce's finding that Mexico was a significant producer of comparable merchandise.

### C. Yixin's Proposed Alternative Surrogate Country

Commerce found that, among the countries at a level of economic development comparable to China, Malaysia, like Mexico, is a significant producer of comparable merchandise.  Decision Memorandum at 53.  However, Commerce found that Malaysia, unlike Mexico, is not a significant producer of identical merchandise because "evidence from the parties show[ed] that Malaysia … does not actually produce quartz surface products," and "no … imports [of this merchandise] into the United States, during 2017, were recorded from Malaysia."  Id. (citing Petitioner Surrogate Country Comments at Ex. 22).  Consequently, Commerce selected Mexico as the primary surrogate country because Mexico was a significant producer of both identical and comparable merchandise, in addition to having the best data availability.  Id. at 63.  Plaintiff disagrees, contending that Commerce should have selected Malaysia as the primary surrogate country.  Yixin Br. at 13–23.

Plaintiff challenges Commerce's reliance on data from petitioner indicating that there were no imports of QSP from Malaysia to the U.S., arguing that Commerce "cannot reject Plaintiff's argument that Malaysia produces identical merchandise on the sole basis

that there were no recorded imports into the United States." Id. at 14.  Yixin's argument is conclusory and does not demonstrate that Commerce acted unreasonably in determining that the lack of imports of QSPs to the U.S. from Malaysia served as a reasonable basis for finding that Malaysia is not a significant producer of identical merchandise.

Plaintiff further argues that "the record clearly evidences that Malaysian companies in fact produce QSP and other reengineered stone products." Id.  Commerce, however, considered and rejected Yixin's argument, concluding that "record evidence shows that, though these [Malaysian companies referenced by Yixin] may produce comparable merchandise, they do not produce identical merchandise." See Decision Memorandum at 57.  Commerce explained why the information on the record did not support a finding that the Malaysia companies proffered by Yixin produced identical merchandise to the subject QSPs.  Id.  Yixin wholly fails to engage with Commerce's analysis and provides nothing more than conclusory assertions that the record supports Yixin's position. Accordingly, the court rejects Yixin's challenge to Commerce's finding that Malaysia is not a significant producer of identical merchandise.

Plaintiff next argues that Malaysia should have been selected as a surrogate country because it "is a more significant producer of either identical or comparable merchandise than Mexico," and challenges Commerce's conclusion that "levels of significance [in the amount of exports to the United States] in comparison with other countries" are not relevant in selecting a surrogate country.  Yixin Br. at 14 (citing Decision Memorandum at 55).  Specifically, Plaintiff states that "import data for the six relevant

Consol. Court No. 19-00140                                               Page 28

HTS codes for the merchandise under consideration" demonstrate that "Malaysia exported the highest volume of merchandise among the countries determined to be at a level of economic development comparable to China."  Id.

Commerce disagreed with Yixin, noting that the antidumping statute grants Commerce discretion in determining which country is a "significant producer," and that Commerce does not consider "levels of significance in comparison with other countries." Decision Memorandum at 55 (citing Policy Bulletin 04.1).  Commerce observed that five of the six categories of merchandise corresponding to the HTS codes relied on by Yixin "have nothing to do with the subject merchandise."  Id. at 56 ("For example, HS 2506.10 … is the HS code Commerce used to value the respondents' raw material inputs of quartz. Another example, HS 6810.11 ('building blocks and bricks' made from cement, concrete, or artificial stone) is not similar to quartz surface products.").  Commerce also noted that, while the analysis to determine "significant producers" by evaluating export data of potential surrogate countries uses HTSUS codes, which are at the ten-digit level, Yixin "attempts to compare these [data] to the Malaysian export data reported on the six-digit level, which are for a broader range of products."  Id.  Commerce highlighted that one of the HS codes mentioned by Yixin (HS 6810.99)—under which the HTSUS code corresponding to "agglomerated quartz slabs of the type used for countertops" (HTSUS 6810.99.0010) can be found—included products such as Buddha statues, which are not identical merchandise.  Id.

Problematically for Plaintiff, the record reasonably supports Commerce's finding that Mexico is both a significant producer of identical merchandise and a significant

producer of comparable merchandise.  To prevail on its substantial evidence challenge here, Plaintiff needed to demonstrate that Malaysia, when compared with Mexico, was the one and only reasonable surrogate country selection on this administrative record, not simply that Malaysia may have constituted another possible reasonable choice.  See Goodluck India Ltd., 2021 WL 3870722 at *7; Globe Metallurgical, 36 CIT at ___, 865 F. Supp. 2d at 1276 (substantial evidence review "contemplates that more than one reasonable outcome is possible on a given administrative record").  Plaintiff has failed to make this demonstration.  The court therefore sustains Commerce's selection of Mexico instead of Malaysia as the primary surrogate country.

### D. Surrogate Value Selection

"If more than one potential surrogate country satisfies the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability."  See Decision Memorandum at 54.  After finding that both Mexico and Malaysia are significant producers of comparable merchandise and that Mexico is a significant producer of identical merchandise, Commerce assessed the availability and reliability of the data from Mexico and Malaysia to select the primary surrogate country.   See id. at 66–85.   When selecting the "best available" data, "Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the [period of investigation], representative of a broad market average, tax and duty exclusive, and specific to the inputs being valued."  Id. at 54 (citing Policy Bulletin 04.1).  Here, Commerce found that "Mexico provide[d] the best surrogate values in terms of specificity, contemporaneity, and quality of the data that is publicly

available." Id. at 63.  Consequently, Commerce selected Mexico as the primary surrogate

country and determined that it would rely on Mexican surrogate data to value quartz

powder FOPs, transportation costs, and financial ratios.  Id. at 54–55, 66–85. Yixin

challenges Commerce's use of these Mexican surrogate values as unreasonable.  Yixin

Br. at 15–26.

**1. Quartz Powder**

Commerce valued respondents' QSP quartz powder input by using Mexican

HS subheading 2506.10, covering "quartz in its crude state, including quartz that has

been ground, powdered, sifted, screened, and separated."  See Decision Memorandum

at 65–66.   Plaintiff challenges as unreasonable Commerce's refusal "to assess the

reliability of Mexican quartz powder values by comparing benchmark prices from Malaysia

and Thailand."  Yixin Br. at 16.  Plaintiff contends that Commerce's refusal was based on

a "procedural technicality (i.e., that mid-way through the proceeding, Thailand was no

longer considered to be a country at a comparable level of economic development to

China by the Department.)."  Id. at 17.  Commerce disagreed that its finding that Thailand

was not at a comparable level of economic development to China was a mere "procedural

technicality."   Rather, Commerce noted that it maintains a practice "to use data from

economically comparable countries as benchmarks to determine whether surrogate

values are aberrational."  See Decision Memorandum at 69.  Commerce emphasized that

the agency is "not required to evaluate data from non-economically comparable countries

when making its surrogate value selections, unless the parties provide information

showing that quality data is unavailable from all of the economically comparable

countries." Id. (citing Clearon Corp. v. United States, Slip Op. 15-91, 2015 WL 4978995 (CIT Aug. 20, 2015)).

Plaintiff challenges Commerce's reliance on Clearon, arguing that this decision only noted that Commerce "is not required to evaluate data from non-economically comparable countries, not that it was precluded from considering this data."  Yixin Br. at 17.  Plaintiff maintains that if the Mexican prices are compared to the prices in Thailand and Malaysia, "Mexican prices are plainly revealed to be unreliable (i.e., aberrational)" because "quartz powder imported into Malaysia, reported on a [cost, insurance, and freight ("CIF")] basis … was roughly valued at $0.14/Kg … [and] quartz imported into Thailand, reported on a CIF basis … was roughly valued at $0.15/Kg," and that, in contrast, "[t]he reported Mexico [free on board ("FOB")] import value of quartz powder is $0.87 per kilo—[multiple] times higher the import values of quartz into Malaysia or Thailand."  Id. at 18–19.  Plaintiff contends that the reason for "Mexico's aberrational quartz prices" is likely that they reflect "higher value technical grade imports from the United States not used in QSP production," noting that 84% of all quartz exports to Mexico come from the U.S.  Id.  Plaintiff further argues that Malaysian data are preferable because they are reported on a CIF basis (whereas Mexican data are reported on a FOB basis), and "Commerce recognizes that the availability of data reported on a CIF rather than FOB basis weighs as a factor against selecting an FOB-based country."  Id. at 15 n.2.  Plaintiff contends that "the price for quartz powder in Malaysia and Thailand are roughly comparable," and that Malaysian data "are therefore public, reliable,

i.e., non/aberrational, reported on a CIF basis, and overall preferable to Mexican data."
Id. at 19.

Yixin's arguments are unpersuasive.  Yixin concedes that Commerce retains the discretion to determine whether the agency should consider data from non-economically comparable countries.  Yixin has failed to demonstrate that, given the record, it was unreasonable for Commerce to refuse to compare the Mexican data against Thai data after finding that Thailand is not economically comparable to China.  Commerce observed that, since no other countries on the list could serve as a source of data to provide a suitable benchmark, Commerce was left with only two countries whose data could be compared—Mexico and Malaysia—and the mere fact that Mexico's data were higher did not demonstrate that Mexico's data were aberrational.  Decision Memorandum at 69.
Commerce also found that higher-grade quartz can be used in the production of QSP and thus disagreed with Yixin's contention that this type of quartz was distorting the Mexican import values.  Id. at 70.  Commerce further explained that it adjusted the Mexican data (reported on a FOB basis) to value them on a CIF basis.  Id. at 71 ("Consistent with our practice, because these data were stated on a FOB foreign port basis, we added an amount for international freight and marine insurance to derive a landed (or CIF) value, in Mexico.").

Given Commerce's explanation, the court cannot agree with Plaintiff that Commerce's surrogate value selection for quartz powder was unreasonable.  Yixin has failed to establish that Commerce's finding that Thailand is not economically comparable to China was unreasonable.  As Commerce explained, its practice is to disregard data

from non-economically comparable countries where alternative data from economically comparable countries is available on the record.  See Decision Memorandum at 68–69. Plaintiff's additional arguments challenging the reasonableness of Commerce's reliance on Mexican data fail for the reasons provided above.  Ultimately, Plaintiff's fundamental argument appears to be that Malaysian data are "preferable to Mexican data" simply because they show lower values.  See Yixin Br. at 16–19.  That is not enough for Plaintiff to prevail.

In summary, Plaintiff has failed to demonstrate that Malaysian data to value quartz powder may have constituted another possible reasonable choice on this administrative record, let alone that the Malaysia data constituted the only reasonable choice.  See Goodluck India Ltd., 2021 WL 3870722 at *7; Globe Metallurgical, 36 CIT at ___, 865 F. Supp. 2d at 1276.  Accordingly, the court sustains Commerce's selection of Mexican surrogate value data for quartz powder.

## 2. Transportation Costs

Commerce valued Yixin's brokerage and handling and truck freight expenses by using "a 20-foot container weight of 15 metric tons from Doing Business in Mexico: 2018." Decision Memorandum at 74.  Plaintiff maintains that Commerce unreasonably refused to "consider benchmark prices in Thailand and Malaysia for transportation costs to assess the reliability of Mexican transportation costs."  Yixin Br. at 19–21.  Plaintiff argues that if the Mexican prices are compared to the prices in Thailand and Malaysia, Mexican prices are revealed to be "unreliable (i.e., aberrational)" because "brokerage and handling costs in Malaysia and Thailand were valued at $0.011383/Kg and $0.011348/Kg respectively,"

and that, in contrast, "brokerage and handling costs in Mexico equaled $0.0322/Kg … a figure which is nearly 300% higher than Malaysia and Thailand." Id. at 20.  Plaintiff further notes that Malaysia reports data on a CIF basis, whereas Mexican data are reported on an FOB basis. Id.  Plaintiff contends that the "transportation cost in Malaysia and Thailand is roughly comparable," and that Malaysian data "are therefore public, reliable, i.e., non-aberrational, reported on a CIF basis, and overall preferable to Mexican data." Id. at 20–21.

Commerce rejected Yixin's comparison between Mexican and Thai prices, finding that Thailand is not economically comparable to China and thus is not appropriate to use it as a surrogate country. Decision Memorandum at 76.  Commerce emphasized that the Malaysian and Thai data preferred by Yixin were also from the 2018 Doing Business publications for those respective countries, and that those sources "use the same methodologies and assumptions (i.e., 20-foot container weighing 15 metric tons) to calculate a brokerage and handling rate as Doing Business in Mexico: 2018." Id.  Commerce thus rejected Yixin's contention, concluding that "Mexican transportation expenses and surrogate values are not distortive or aberrational merely by virtue of being larger." Id. at 76–77.

Plaintiff's preference for an alternative basis for valuing transportation expenses at a lower rate is insufficient to demonstrate that Commerce's decision was unreasonable.  Plaintiff points to nothing in the record to require a contrary outcome. Accordingly, the court sustains Commerce's calculation of transportation costs.

### 3. Financial Statements

Commerce calculated surrogate financial ratios (manufacturing; overhead; selling, general & administrative ("SG&A"); and profit) by using the financial statements of Grupo Lamosa, a Mexican producer of ceramic tile.  See Decision Memorandum at 80.  Plaintiff argues that this was unreasonable, contending that Commerce should have instead used the financial statements from the Malaysian company, Marbon Industries SDN BHD ("Marbon").  Yixin Br. at 21.  Specifically, Plaintiff argues that the Malaysian financial statements are superior because they are from companies manufacturing identical merchandise, and that Commerce erred in using financial statements from companies producing ceramic tiles because ceramic tiles are not comparable merchandise.  Id. at 22.  Plaintiff also challenges Commerce's refusal "to assess the reliability of Mexican financial statements by comparing benchmark financial statements from Malaysia and Thailand."  Id. at 21.  Plaintiff maintains that if the financial ratios calculated by using the Mexican financial statements are compared to those calculated by using data from Malaysia and Thailand, Mexican financial statements are revealed to be "unreliable (i.e., aberrational)."  Id. at 22.  Plaintiff contends that "Mexican financial statements yield surrogate financial ratios with roughly 700%-1,000% higher SG&A expenses, and roughly 300%-500% higher reported Profit, than Malaysian and Thai financial statements, and are clearly unreliable (i.e. aberrational)."  Id. at 22–23.

"In selecting financial statements for purposes of calculating financial ratios, Commerce's policy is to use data from ME surrogate companies based on the 'specificity, contemporaneity, and quality of the data.'"  Decision Memorandum at 80.  "Additionally,

Consol. Court No. 19-00140                                                                 Page 36

Commerce has a regulatory preference to value all FOPs from a single surrogate country."  Id. at 81.  Commerce disagreed with Yixin's argument that the Malaysian financial statements were superior to those from Mexico, explaining that the agency has "determined that ceramic tiles are a comparable product to quartz surface products … and, accordingly, a producer of ceramic tiles is representative of an NME producer of quartz surface products' production experience….  Additionally, Grupo Lamosa's financial statements are completely translated, publicly available, contemporaneous with the POI, show profit before taxes, do not contain countervailable subsidies, are sufficiently detailed to calculate financial ratios, and are from the primary surrogate country."  Id. at 81–82.

Commerce further determined that there were various problems with the proposed Malaysian financial statements that rendered them "inappropriate" for using to value the surrogate financial ratios.  Id. at 83–84 (noting various flaws with Malaysian data including finding that Marbon had negative profit ratio, finding that another Malaysian company with data on record did not produce comparable merchandise, and fact that remaining Malaysian company's data was not contemporaneous).  Consequently, Commerce rejected Yixin's proposed comparison of Mexican and Malaysian financial ratios to Thai financial ratios, reiterating that the agency has found that Thailand is not economically comparable to China and noting that "benchmarking of financial ratios is of limited use" because "financial statements are company-specific, related to an individual company's production and sales experience."  Id. at 83.  Commerce thus refused to use Malaysian financial statements, finding them "unusable or less preferable when compared to Grupo Lamosa's statements."  Id.

Commerce explained why it disagreed with Yixin that Malaysian companies produce identical merchandise and that ceramic tiles are not comparable to QSPs.  See Decision Memorandum at 81.  Commerce also explained why it rejected Yixin's proposal to consider Thai financial data as a benchmark.  Id. at 83.  Given this record, Plaintiff's only argument as to why Commerce's selection of Mexican data for calculating surrogate financial ratios was unreasonable is that this selection results in higher values than would result from selecting Malaysian financial statements.  See Yixin Br. at 22–23.  This argument is not persuasive.  Plaintiff has failed to demonstrate that the Malaysian financial statements constituted the only reasonable choice for Commerce on this administrative record.  See Goodluck India Ltd., 2021 WL 3870722 at *7; Globe Metallurgical, Inc., 36 CIT at ___, 865 F. Supp. 2d at 1276.  Accordingly, the court sustains Commerce's selection of Mexican financial statements for the calculation of surrogate financial values.

Alternatively, Plaintiff argues that even if only financial statements from Mexico are used for calculating surrogate financial ratios, then Commerce should be directed to average the financial statements of the two Mexican ceramic tile producers on the record (Grupo Lamosa and Unigel).  See Yixin Br. at 23–26.  Specifically, Plaintiff challenges Commerce's finding that Unigel's financial statements cannot be used because Unigel "operated at a loss before taxes for the three years covered by the financial statements," as Commerce's current practice is to reject financial statements showing zero profit.  Id. Plaintiff maintains that Commerce's current practice "is grounded solely on preference" because there is "no statutory impediment preventing the use of financial statements

submitted by unprofitable companies" and notes that Commerce has the task of "calculating dumping margins as accurately as possible using the 'best available information.'"  Id. at 24.  Plaintiff requests that the court direct Commerce "to return to its past practice of zeroing profit figures and averaging overhead and SG&A expenses," and abandon its current practice of "summarily rejecting otherwise credible financial statements showing negative profit, at least in instances where the record would otherwise only contain a single financial statement."  Id. at 25.  Finally, Plaintiff contends that its "suggestion is to look first to the profit figure established on the record, incorporate that percentage into the financial ratio of the company with negative profit, and allocate the remaining overhead, and SG&A costs on a proportional basis," and that, in case the court "disagrees with the practice of zeroing reported Profit," it should direct Commerce "to use a weighted-average of Overhead, SG&A and Profit."  Id.

In rejecting the suggestion that Commerce use an average of Grupo Lamosa and Ungiel's financial statements, Commerce explained:

> Unigel's financial statements are not usable because the company operated at a loss before taxes for the three years covered by its financial statements; Commerce's preference is to disregard financial statements showing a loss, if alternative statements are available.  Moreover, Unigel is a Brazilian company, that makes solid surfaces in Mexico through a subsidiary.  Thus, it is not clear what proportion of its operations involve comparable merchandise in the surrogate country or if Unigel's consolidated statements could be considered those of a Mexican company.  Commerce prefers to value all FOPs in a single surrogate country.

Decision Memorandum at 81–82.

Contrary to Plaintiff's representations, Commerce's refusal to average Unigel's financial statements was not based "solely" in Commerce's practice of rejecting financial statements showing a loss.   See Decision Memorandum at 82; cf. Yixin Br. at 23. Commerce emphasized its policy preference "to value all FOPs in a single surrogate country" and highlighted its concern with the fact that Unigel is a Brazilian company operating in Mexico through a subsidiary.   Decision Memorandum at 82 (noting that it is not clear "what proportion of  [Unigel's] operations involve comparable merchandise in the surrogate country or if Unigel's consolidated financial statements could be considered those of a Mexican company").   Given this explanation, the court thus concludes that Commerce's selection of only Grupo Lamosa's financial statements to calculate the surrogate financial ratios was reasonable.

Additionally, Plaintiff's challenge to Commerce's practice of rejecting financial statements showing a loss as unreasonable is not persuasive.  Plaintiff suggests that Commerce abandon its current practice of rejecting financial statements showing a loss and adopt a "more accurate methodology" that would allow Commerce to calculate dumping margins "as accurately as possible using the 'best available information.'"  Yixin Br. at 24.  While Plaintiff maintains that Commerce's practice to reject financial statements with zero or negative profit is "excessively wasteful," Plaintiff fails to demonstrate that including such data actually results in a "more accurate methodology."   Id. at 23–25. Instead, Plaintiff merely provides a "suggestion" that Commerce adopt (at the court's direction) an alternative, more reasonable practice.   Id. at 25.   When challenging Commerce's selection of the "best available" data from surrogate countries under

Consol. Court No. 19-00140                                              Page 40

19 U.S.C. § 1677b(c), Plaintiff must demonstrate that no reasonable mind could conclude that Commerce chose the best available information.  See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (explaining that court's "duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'").  Yixin has failed to meet this burden.  Accordingly, the court sustains Commerce's calculation of surrogate financial ratios.

### IV. Conclusion

For the foregoing reasons, the court denies Yixin's motion for judgment on the agency record and sustains the Final Determination as to Commerce's determinations on Yixin's respondent-specific issues.

                                                              /s/ Leo M. Gordon
                                                              Judge Leo M. Gordon

Dated: September 24, 2021
       New York, New York